IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION

| | | |
|---|---|---|
| JONATHAN HANSLEY | ) | |
| | ) | |
| Plaintiff, | ) | CASE NO: 7:23-CV-78 |
| | ) | |
| v. | ) | |
| Exeter Finance, LLC, | ) | |
| | ) | |
| Associate Asset Recovery, LLC | ) | **JURY DEMAND REQUESTED** |
| Defendant | | |
| | ) | |
| | ) | |

FILED JUL 07 2023 UNITED STATES DISTRICT COURT MIDDLE DISTRICT OF GEORGIA

## COMPLAINT

## PRELIMINARY STATEMENT

1. Plaintiff, Jonathan Hansley, brings this action against the defendants, Exeter Finance, LLC ("Exeter") and Associate Asset Recovery, LLC ("AAR") pursuant to the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq.*, the Truth In Lending Act ("TILA"), 15 U.S.C. § 1605 *et seq.*, and the Georgia Uniform Commercial Code ("UCC") *et seq.*

## JURISDICTION AND VENUE

2. This Court has jurisdiction pursuant to 15 U.S.C. § 1692k(d), 28 U.S.C. § 1331, and 28 U.S.C. § 1367.

3. Venue is proper before this Court pursuant to 28 U.S.C. § 1391(b), where the acts and transactions giving rise to Plaintiff's action occurred in this district, where Plaintiff resides in this district, and where Defendants, Exeter, and AAR transact business in this district.

## PARTIES

4. Plaintiff is a natural person who, at all relevant times, resided in the City of Douglas, Coffee County, Georgia.

5. Plaintiff is a "consumer" as defined by 15 U.S.C. § 1692a(3).

6. Defendant, Exeter Finance, LLC ("Exeter"), is a business entity that regularly conducts business in the state of Georgia and has a place of business located at 2101 W. John Carpenter FWY, Irving, Texas 75063.

7. Defendant, Associate Asset Recovery, LLC ("AAR"), is a limited liability company that does business and is located in Georgia at 3116 U.S. 41 S., Tifton, GA 31794.

8. At all relevant times, AAR was acting as a repossession agent working at the behest of Exeter.

9. At all relevant times, AAR was an entity using instrumentalities of interstate commerce or the mail in a business, the principal purpose of which was the enforcement of security interests.

10. AAR is "debt collector" as defined by 15 U.S.C. § 1692a(6).

## FACTUAL ALLEGATIONS

11. The plaintiff relates the above as if they were recited verbatim.

12. On December 12, 2020, the Plaintiff purchased a 2019 Kia Optima (the "Vehicle") from a non-party, Woody Folsom CDJR of Douglas.

13. The plaintiff purchased the vehicle for his own personal, family, and household use.

14. The vehicle constitutes "consumer goods" as defined by Ga. Code § 11-9-102(a)(24).

15. The plaintiff financed the purchase of the Vehicle.

16. In connection with the transaction, Plaintiff executed a loan agreement ("the Contract"), which granted Woody Folsom CDJR of Douglas and its assignees a security interest in the Vehicle. **Original Contract Enclosed**

17. The vehicle constitutes "collateral" as defined by Ga. Code § 11-9-102(a)(13).

18. After the Contract was executed, it was assigned to Exeter. **(Exhibit A)**

19. Exeter is a "secured party" as defined by Ga. Code § 11-9-102(a)(72).

20. Sometime later, the plaintiff discovered there had been fraud in his contract.

21. Plaintiff exercised his right of rescission pursuant to 15 U.S.C. § 1635 on January 9, 2023, by sending a rescission letter via certified mail. **(Exhibit B)**

22. Along with the right of rescission letter, the plaintiff sent an Affidavit of Fact ("AOF") to the defendant, Exeter, outlining the specific fraudulent activity in the contract that was not in compliance with violations they claim to abide by. **(Exhibit C)**

23. Plaintiff also filed a complaint with the Consumer Financial Protection Bureau (hereinafter "CFPB") against Defendant Exeter on January 9, 2023. **(Exhibit D)**

24. On January 24, 2023, Exeter responded to the CFPB complaint by outlining the specifics of how the contract came into being and submitting a contract the Plaintiff allegedly signed and a statement of account as attachments. **(See Ex. D and Exhibit E )**

25. The Plaintiff discovered right away that the contract he originally took with him when he left the dealership was different from the one Exeter had on file for his account after reviewing the contract Exeter posted through the CFPB website. The contract that the Plaintiff signed is not the one Exeter purports to have on file. The Plaintiff's signature is forged on Exeter's contract. **(See Ex. A and Ex. E for comparisons.)**

26. Plaintiff sent a Cease and Desist ("C&D") via certified mail to the Defendant, Exeter, on January 25, 2023. **(Exhibit F)**

27. Exeter Finance sent two letters via mail on January 31, 2023, to the plaintiff, one stating the validation of the alleged debt and the other responding to his C&D and rescission notice. **(Exhibit G )**

28. The rescission letter from the Plaintiff was disregarded, ignored, and rejected by Exeter.

29. In accordance with the arbitration clause in the original contract and what to do if there was a dispute between the two parties, Plaintiff then made the decision to file for arbitration with the American Arbitration Association (hereinafter "AAA") on February 21, 2023. **(Exhibit H) (See the original contract enclosed.)**

30. The AAA Consumer Filing Team contacted Exeter's representatives (hereinafter "Exeter's rep"), Tim Patterson and Ashlee Yates, through shared email with the Plaintiff and the AAA's case manager on March 6, 2023, at the start of the arbitration, informing them that the demand for arbitration letter needed to be signed by both parties and submitted back via shared email in order to proceed.

31. Tim Patterson, Exeter's rep, requested a copy of the arbitration provision from the parties' joint contract in the shared email message to the plaintiff. The plaintiff forwarded a copy of the arbitration clause along with a signed demand to arbitrate letter to the shared email.

32. Exeter's rep, Tim Patterson, claimed that the Plaintiff lacked the right to arbitrate since there was no arbitration provision in his contract with Exeter after receiving the documentation he had requested from the assignee.

33. In a letter sent to the plaintiff on March 10, 2023, Exeter Finance threatened legal action if the plaintiff kept in touch with them regarding the fraudulent contract. **(Exhibit I)**

34. On March 14, 2023, The AAA's Consumer Filing Team emailed all parties, stating that the arbitration case was closed due to Exeter not meeting any of the Requirements. **(Exhibit J)**

35. Exeter Finance, LLC, stopped communicating with the Plaintiff, barred him from their website's online payment system, and reported the vehicle as a charge off and bad debt on the Plaintiff's credit report. **(Exhibit K)** There was no interaction between the Defendant and the Plaintiff for nearly two and a half months.
**ASSOCIATE ASSET RECOVERY, LLC (All evidence of this interaction is recorded on plaintiff's wife's cellular device.)**

36. On June 6, 2023, at or around 8:15pm EST, a tow truck operator named Larry (hereinafter "operator"), who is an employee for Associate Asset Recovery ("AAR") towed the Plaintiff's vehicle at the plaintiff's address, 900 N. Wheeler Ave., Douglas, GA 31533.

37. The plaintiff approached the tow truck operator with a series of questions, one of which asked the operator why he was towing his property. The operator claimed Exeter owned the car and that he was assigned to take it. The plaintiff demanded the vehicle be released, but the operator towed the vehicle and instructed the plaintiff to contact Exeter Finance for any questions or financing issues.

38. On June 5, 2023, the plaintiff sent a notice of intent to AAR to add them to a federal lawsuit with Exeter Finance, LLC, via certified mail if they did not hand him his vehicle on the date of his scheduled appointment with the company, AAR. **(Exhibit L)**
39. The plaintiff was scheduled to go pick up his items from the car on June 9, 2023. Valuable items and private papers, as well as the plaintiff's wife's wedding band, and prenatal images of their daughter.
40. Since AAR was determined not to give the plaintiff his car back, he and his wife went to the company expecting to get his possessions back. The manager, who immediately started recording the plaintiff and his wife upon arrival, treated him in a disrespectful manner. The manager poked her head out to tell him that while he was allowed inside, his wife was not. The plaintiff's wife then took out her phone and began recording from the building's exterior.
41. The manager gave the plaintiff instructions to sign papers that the defendant, Exeter, had sent over. He read it and then questioned the documentation. He specifically questioned the manager about her request that he sign a document certifying that he previously received his stuff when he had not. She simply stated, "It just says that; once you sign off on this, we'll give you your belongings." Uneasy, the plaintiff took the papers outside to speak with his wife and check with her that he was understanding the documents properly.
42. The manager chased him outside while yelling, "You can't take my paper off with you." The plaintiff noticed that she was still recording him. He returned and said he wouldn't sign the document until he had personally gone to collect his items. The manager informed him that his belongings had already been taken out of the car and

placed in a black bag. The manager added that the only items they couldn't retrieve were those in the locked trunk of the car, for which they needed the plaintiff's keys. The plaintiff asked how they managed to enter his car, given that the doors were locked. She admitted that they forced their way into the car.

43. Because he didn't feel comfortable, the plaintiff went outside and told his wife to call the police. A deputy from the Tifton Police Department was en route to them, according to the plaintiff's wife. The wife kept recording everything that happened after hanging up.

44. At or about 4:53 p.m. EST, Deputy Womack of the Tifton Police Department, wearing badge number Tift38, arrived on the site. The plaintiff's wife immediately began chatting with him about the entire scenario up to that point. The plaintiff went inside to explain that what they had done was illegal and that he had not given them permission to enter his car, touch, or dump him and his wife's priceless possessions into a plastic bag as though they were trash.

45. The deputy was present to maintain order, but he was unable to persuade the defendant, AAR, to let the plaintiff go to recover his possessions on his own. The plaintiff had to give the manager his keys and license in order for them to place the remainder of his stuff into another garbage bag that was in the trunk. Due to the fact that all of the plaintiff's belongings were scattered around in two different garbage bags, he was unable to determine if anything was missing, broken, or damaged. Later, the plaintiff discovered that his wife's sonogram images of their child had been ruined, torn, and crumbled. One of the garbage bags had liquid contents inside it that had spilled over,

and some papers that had been placed inside an envelope were visible outside the envelope as if someone were reading them.

46. The plaintiff later learned that Exeter would be selling off his car in a letter dated June 5, 2023, which he received on June 27, 2023. **(Exhibit M)**

47. Without receiving a communication from Exeter beforehand, the plaintiff wrote to the Chief Financial Officer ("CFO"), Jason Kulas, on June 16, 2023, demanding information about his account in full. **(Exhibit N)**

48. At all times relevant hereto, the defendants, Exeter and AAR, were acting by and through their servants, agents, and/or employees who were operating in accordance with the terms of their employment or agency and directly under their direct supervision and control.

## COUNT I:

### VIOLATION OF 15 U.S.C. § 1692 et seq., AND GA. UCC CODE et seq.

49. Plaintiff relates the above paragraphs as if they were recited verbatim.

50. At all times relevant hereto, AAR was attempting to collect an alleged debt incurred for personal, family, or household purposes, which is a "debt" as defined by 15 U.S.C. § 1692a(5).

51. At the time the aforementioned defendant, AAR, engaged in the collection and repossession activities described above, AAR, was a debt collector as defined by 15 U.S.C. § 1692a(6) insofar as:

    a. AAR uses a tow vehicle as an instrumentality of interstate commerce in its business, the principal purpose of which is the enforcement of security interests.

52. Defendant, AAR, by their conduct as described above in repossessing the plaintiff's vehicle without any preceding default and thereby causing damage to the property in the vehicle, violated the FDCPA as follows:
    a. §1692f(1) by taking the vehicle when the secured party had no interest in plaintiff's property or any agreement with plaintiff regarding plaintiff's property and in a commercially unreasonable manner in connection with the repossession, which is not permitted by law.
53. "Repossession" of the subject vehicle collateral by Defendant EXETER and its agent, AAR, falls within the definition of "consumer goods," which is described above.
54. The defendant is also in violation of 15 U.S. Code § 1692e(2)(A) by giving false representation of the amount of debt allegedly owed and by using false representation or deceptive means to attempt to collect any debt Pursuant to 15 U.S. Code § 1692e(10).
55. On the CFPB website, Exeter published a fictitious contract that the plaintiff had never seen or signed. The annual percentage rate ("APR") of the contract Exeter has is completely different from the APR that's on the plaintiff's original contract.
56. The defendant, Exeter, states on the contract that they are the creditor, but pursuant to 15 U.S.C § 1692a(4), the plaintiff is the true creditor because he extended his credit.
57. The UCC Title 13, Ch. 4, Article 4 § 13-4-60 states that in order to show fraud and misrepresentation in the procurement of the contract as a defense to an action on the contract, it is not sufficient to show that false representations were made that were known to be false and that were made with the intention to deceive. It must also be shown that they exercised due care to discover the fraud. *Charter Medical Mgt. Co. v. Ware Manor, Inc., 159 Ga. App. 378, 283 S.E.2d 330 (1981).*

58. Let it be known that the Plaintiff made it clear about the fraudulent activity and attempted to rectify the situation through arbitration before filing a lawsuit.

59. The UCC Title 13, Ch. 4, Article 4 § 13-4-60 also states that If purchaser of personal property has been injured by false and fraudulent representations of seller as to subject matter thereof, the purchaser ordinarily has the choice whether to rescind contract, return article, and sue in tort for fraud and deceit, or whether to affirm contract, retain article, and seek damages resulting from fraudulent misrepresentation. *Bob Maddox Dodge, Inc. v. McKie, 155 Ga. App. 263, 270 S.E.2d 690 (1980).*

## COUNT II:

## VIOLATION OF THE TRUTH IN LENDING ACT AND 15 U.S.C § 1605 et seq.

60. Plaintiff relates the above paragraphs as if they were recited verbatim.

61. An employee of Woody Folsom, a non-party, as well as an employee of the defendant Exeter, both assured the plaintiff that his APR wouldn't alter at all. There are two different yearly percentages on the contract, as shown in **Exhibits A and E**.

62. In accordance with 15 U.S.C. § 1601, the TILA mandates that lenders point out particular disclosures regarding crucial terms, such as the APR, before becoming legally liable for the loan.

63. In accordance with TILA, 15 U.S.C. § 1605 states that the amount of the finance charge in connection with any consumer credit transaction shall be determined as the sum of all charges, payable directly or indirectly by the person to whom the credit is extended.

64. The defendant, Exeter, violated this right, as shown in **Exhibit A** as the finance charge is not the sum of all charges.

65. In accordance with TILA, Any of the following costs that apply as mentioned below are examples of charges that are included in the finance fee. In accordance with 15 U.S. Code 1605(c), Charges or premiums for insurance policies written in connection with any consumer credit transaction that cover liability resulting from the ownership or use of property must be included in the finance charge. This includes insurance policies that cover property damage and liability.

66. The defendant, Exeter, violated this right, as shown in **Exhibit A** which was not included in the finance charge.

67. In accordance with TILA, On the plaintiff's contract under the Retail Installment Sale Contract, it states, "You, the buyer, may buy the vehicle below for cash [OR] on credit. By signing this contract, you chose to buy the vehicle on credit under the agreements in this contract. You agree to pay the Seller/Creditor the amount financed and finance charge in U.S. funds according to the payment schedule below. We will figure your finance charge on a daily basis. The Truth-In-Lending-Disclosures below are part of this contract."

68. The defendant, Exeter, is in violation of 15 U.S. Code § 1605(a). The finance charge does not include charges of a type payable in a comparable cash transaction (i.e., deposits or monthly payments).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Jonathan Hansley respectfully requests that this court award the following:

a. Actual damages pursuant to 15 U.S.C. § 1692k;

b. Statutory damages pursuant to 15 U.S.C. § 1692k;

c. An award under the UCC of finance charges of $500 plus 10% of the value of the vehicle for repossession;

d. Punitive damages;

e. Any other relief that is just and appropriate

6-29-2023
DATE

JONATHAN HANSLEY
Pro Se Party